Approved: *[signature]* **14 MAG 1512**
BRENDAN F. QUIGLEY
Assistant United States Attorney

Before:   THE HONORABLE ANDREW J. PECK
          United States Magistrate Judge
          Southern District of New York

------------------------------------X
                                    :
UNITED STATES OF AMERICA,           :
                                    :     **SEALED**
          - v. -                    :     **COMPLAINT**
                                    :
ISRAEL REYES, a/k/a "PC,"           :     Violation of
ALFREDO SANCHEZ, a/k/a "Gordo,"     :     21 U.S.C. § 846
ALEXANDER MORILLO,                  :
and                                 :     COUNTY OF OFFENSE:
JOSMARIL RODRIGUEZ,                 :     BRONX
                                    :
          Defendants.                :
                                    :
------------------------------------X

SOUTHERN DISTRICT OF NEW YORK, ss.:

   JARROD HALBER, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration, and charges as follows:

                        COUNT ONE

   1.   From at least in or about February 2014, up to and including in or about July 2014, in the Southern District of New York and elsewhere, ISRAEL REYES, a/k/a "PC," ALFREDO SANCHEZ, a/k/a "Gordo," ALEXANDER MORILLO, and JOSMARIL RODRIGUEZ, the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

   2.   It was a part and an object of the conspiracy that ISRAEL REYES, a/k/a "PC," ALFREDO SANCHEZ, a/k/a "Gordo," ALEXANDER MORILLO, and JOSMARIL RODRIGUEZ, the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1).

3.  The controlled substance that ISRAEL REYES, a/k/a "PC," ALFREDO SANCHEZ, a/k/a "Gordo," ALEXANDER MORILLO, and JOSMARIL RODRIGUEZ, the defendants, conspired to distribute and possess with the intent to distribute was mixtures and substances containing one kilogram and more of heroin, in violation of 21 U.S.C. § 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

4.  I am a Special Agent with the Drug Enforcement Administration ("DEA"). I have been personally involved in the investigation of this matter, and I base this affidavit on that personal experience, as well as on my conversations with other law enforcement agents, and my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Background

5.  Since approximately early 2014, the DEA has been investigating a drug trafficking organization (the "DTO") that is distributing heroin to customers from throughout the greater New York City area.

6.  Specifically, in or about February 2014, the DEA learned from a confidential source ("CS-1")[1] that the DTO was led by a person known to CS-1 as "PC" and was operating, at that time, in the vicinity of 355 East 187th Street in the Bronx ("Location-1"). Location-1 is an apartment complex consisting of multiple buildings.

7.  CS-1 later identified a photograph of ISRAEL REYES, a/k/a "PC," the defendant, as "PC."

---

[1] CS-1 is a paid confidential informant who has provided reliable information in this and other DEA investigations. Specifically, information by CS-1 has been corroborated in other investigations by multiple narcotics seizures and has resulted in multiple arrests. Further, information provided by CS-1 in this investigation has been corroborated by surveillance and the wiretap interceptions discussed below.

2

## CS Purchases from the DTO

8. CS-1 subsequently purchased heroin from the DTO at the direction of the DEA on three separate occasions.

9. One of these purchases occurred on or about April 16, 2014. Based on my own involvement with this investigation and my conversations with other DEA agents, I have learned that, during that purchase, the following occurred:

   a. CS-1 made a telephone call to ISRAEL REYES, a/k/a "PC," the defendant, at a phone number ending in 2165 (the "2165 Phone"). Before making the call, CS-1 placed the phone on speaker so that I and other DEA agents could listen to what was said. On the call, "PC" agreed to sell CS-1 a quantity of heroin and directed CS-1 to a location in the vicinity of 1497 Crotona Place, Bronx, New York ("Location-2").

   b. Later that same day, CS-1 went to Location-2, while under DEA surveillance. I and other DEA agents observed a male, later identified as ALEXANDER MORILLO, the defendant, come out of Location-2, where he appeared to provide CS-1 with a package ("Package-1").

   c. CS-1 subsequently provided Package-1 to me and other DEA agents. I examined the contents of Package-1 which contained approximately ten bundles of a substance that, based on my training and experience, appeared to be heroin based both on the appearance of the substance itself and the presence of a "stamp" or writing on the packaging that I know to be used by heroin dealers.

   d. The contents of the Package were subsequently tested by a DEA laboratory. The lab tests showed that the Package contained approximately 3.7 grams of heroin.

10. Another purchase occurred on or about May 1, 2014. Based on my own involvement with this investigation and my conversations with other DEA agents, I have learned that, during that purchase, the following occurred:

   a. CS-1, at the direction of the DEA, again called ISRAEL REYES, a/k/a "PC," the defendant, at the 2165 Phone and, in substance, asked to buy a quantity of heroin. Before making the call, CS-1 placed the phone on speaker so that I and other DEA agents could listen to what was said. In sum and substance and part, REYES asked CS-1 "what floor," and CS-1 replied "four, the fourth." REYES then directed CS-1 to a street in the vicinity of Location-1.

        b. Based on my training and experience and conversations with CS-1 and with other DEA agents, I believe that when ISRAEL REYES, a/k/a "PC," the defendant, asked "what floor," he was asking CS-1 what quantity of heroin CS-1 wanted to purchase. When CS-1 responded "four, the fourth," he was referring to forty bundles of heroin.

        c. CS-1 then went to that location, while I and other DEA agents conducted surveillance. Agents observed ALEXANDER MORILLO, the defendant, approach and enter CS-1's car. After a few minutes, MORILLO exited CS-1's car.

        d. Other DEA agents later debriefed CS-1. CS-1 told the agents, in substance, that MORILLO had provided CS-1 with a package ("Package-2"), which CS-1 provided to another DEA Agent ("Agent-1"). Based on my conversations with Agent-1 and a review of a DEA report, I have learned that Package-2 appeared to contain 40 bundles of glassine envelopes of heroin. The DEA subsequently field tested the contents of Package-2, which indicated that Package-2 contained heroin.

    11. Subsequently, CS-1 informed the DEA that ISRAEL REYES, a/k/a "PC," the defendant, was using a new phone, with the call number (917) 601-3079 (the "3079 Phone"). According to records obtained from the service provider, the subscriber for the 3079 Phone is JOSMARIL RODRIGUEZ, the defendant.

    12. Based on my own involvement in this investigation and my conversations with other DEA agents, I have learned the following events took place on or about May 20, 2014.

        a. CS-1, at the direction of the DEA, called ISRAEL REYES, a/k/a "PC", the defendant, at the 3079 Phone and, in substance and in part, requested to buy a quantity of heroin. Before making the call, CS-1 placed the phone on speaker so that I and other DEA agents could listen to what was said. We then observed CS-1 making the call. REYES asked CS-1 "what floor?" CS-1 responded "Dime. I'm picking up a dime." REYES responded "okay, come through."

        b. CS-1 then went to the vicinity of Location-1, while I and other DEA agents conducted surveillance. Agents observed ALEXANDER MORILLO, the defendant, approach and enter CS-1's car. After a few minutes, MORILLO exited CS-1's car.

        c. Other DEA agents and I later debriefed CS-1. CS-1 told us, in substance, that MORILLO had provided CS-1 with a package ("Package-3"). I and another agent took custody of Package-3. Package-3 appeared to contain ten bundles of heroin.

d. The DEA subsequently field tested the contents of the package, which showed that the package in fact contained heroin.

13. Based on my training and experience and debriefing of CS-1, I believe that when ISRAEL REYES, a/k/a "PC," the defendant, asked "what floor," he was asking CS-1 what quantity of heroin CS-1 wanted to purchase. When CS-1 responded "dime," he was referring to ten bundles of heroin, and when REYES responded "okay, come through," he was indicating that CS-1 should come to the vicinity of Location-1 to receive the heroin.

### Wire Intercepts and Physical and Electronic Surveillance

14. On or about June 10, 2014, United States District Judge John F. Keenan signed orders authorizing the DEA to intercept voice communications over the 3079 Phone and over phone number (347) 717 2464 (the "2464 Phone"). Interceptions on both phones began shortly thereafter and have continued to the present.

15. The DEA initially believed that ISRAEL REYES, a/k/a "PC," the defendant, was the primary user of both the 3079 Phone and the 2464 Phone. Subsequent interceptions revealed, however, that while REYES was the primary user of the 3079 Phone, ALEXANDER MORILLO, the defendant, was the primary user of the 2464 Phone.

16. Based on my review of preliminary, draft summaries and translations of communications intercepted over the 3079 and 2464 Phones, I have learned that callers routinely told ISRAEL REYES, a/k/a "PC," and ALEXANDER MORILLO, the defendants, that they were on a particular "floor," the same term CS-1 had used to request a particular quantity of heroin during the calls referenced in paragraphs 10(a) and 12(a) above. In other calls, callers referred to a numeric quantity (e.g., "eight").

17. Based on the buys involving CS-1, I believe that the DTO sells heroin in a "bundle" of ten glassines of heroin, that each bundle contains approximately .32 grams of heroin, and that, when a caller specified a particular "floor" or quantity, they were requesting a number of bundles.

18. During interceptions over the 3079 Phone and 2464 Phone, monitors tallied the approximate number of bundles that the DTO agreed to sell to customers. This tally showed that the DTO sold at least 6,236 bundles of heroin between when interceptions began on the 3079 Phone on June 11 and July 4,

5

2014. Given that each bundle contains approximately .32 grams of heroin, I believe that the DTO sold at least 1.9 kilograms of heroin between June 11 and July 4.[2]

   19.  Based on my review of preliminary, draft summaries and translations of communications intercepted over the 3079 and 2464 Phones, I have learned that ISRAEL REYES, a/k/a "PC," and ALEXANDER MORILLO, the defendants, often directed the customers to the vicinity of Location-1, as evidenced by the frequent use of terms like "dead end," "stairs," and "Marion" during the intercepted calls.[3]  Agents, including myself, frequently observed ALEXANDER MORILLO, the defendant, meeting cars in the vicinity of Location-1 for the purpose of conducting what appeared to be, based on my training and experience, narcotics transactions.

   20.  For example, based on my review of a preliminary, draft summary of a call intercepted over the 3079 Phone and my training, experience, and involvement with this investigation, I have learned that on or about June 15, 2014, at approximately 8:17 p.m., a co-conspirator not named as a defendant herein ("CC-1") placed a call to ISRAEL REYES, a/k/a "PC," the defendant, using the 3079 Phone. During the call, the following conversation took place, in substance and in part:

REYES:          Yo

CC-1:           Yo, I'm here, yo?

REYES:          What floor you on?

CC-1:           Sixth floor

REYES:          You . . . you at the dead end?

CC-1:           Yeah, I am the dead end.

---

[2] This analysis assumes that each "floor" is equal to a single bundle. As evidenced by CS-1's purchase in paragraph 10 above, in some cases, the number of "floors" is one-tenth of the number of bundles (i.e., "four" equates to 40 bundles). Thus, the analysis above may actually underestimate the total amount of heroin sold by the DTO since June 11.

[3] Based on my involvement in this investigation, I know that East 187th Street dead ends in the vicinity of Location-1. At the end of the dead end, there are stairs, which lead down to Marion Avenue.

6

| | |
|---|---|
| REYES: | A'right, say no more. |
| CC-1: | Hey, yo! |
| REYES: | Yo |
| CC-1: | Yo. There's police around the corner, man. You know what I mean? Down the...down the street though. You know? |
| REYES: | What? Blue and white? |
| CC-1: | Yeah. But, yeah. Blue and white basically. |
| REYES: | Yeah. They good though. Don't worry about it. They just be there just to be there. |
| CC-1: | A'ight |
| REYES: | They don't fuck with nobody. Unless they see something. |
| CC-1: | Yeah. I know. I know. I just wanted to let you know. |
| REYES: | A'ight. Good looking. |
| CC-1: | A'ight. |
| REYES: | [Aside: I' mma hook up six kits. You heard? Six.] |

21.  Based on my training and experience and involvement in this investigation, I believe the "sixth floor" refers to six bundles of heroin, "dead end" refer to the dead end of East 187th Street in the vicinity of Marion Avenue, and the references to "blue and white" refers to a marked New York City Police car.

22.  Based on my review of preliminary, draft summaries and translations of communications intercepted over the 3079 and 2464 Phones, I have learned that ISRAEL REYES, a/k/a "PC," and ALEXANDER MORILLO, the defendants, also repeatedly discussed the status of the DTO's activities.

   a. For example, based on my review of a preliminary, draft summary of a call intercepted over the 2464 Phone, and my training, experience, and involvement with this investigation, I have learned that on or about June 27, 2014, at approximately 1:40 p.m., REYES, using a phone number ending in 9970, called

7

MORILLO at the 2464 Phone. Based on my review of records obtained from the service provider, I have learned that he subscriber for the 9970 Phone is JOSMARIL RODRIGUEZ, the defendant. During the call, the following conversation took place, in substance and in part:

| | |
|---|---|
| MORILLO: | Yo. |
| REYES: | Yo, I'm calling you |
| MORILLO: | I didn't know that was your number? |
| REYES: | How many you got left? |
| MORILLO: | 65 and 14 pieces. |
| REYES: | 14? |
| MORILLO: | Yeah? |
| REYES: | Alright, I'm gonna bring you two more boxes. |
| MORILLO: | Alright, no problem |
| REYES: | Alright |
| MORILLO: | Alright |

   b. Based on my training, experience, and involvement with this investigation, I believe that during this call, REYES was inquiring about the quantity of heroin that MORILLO had on hand to sell to customers of the DTO ("How many you got left?"). MORILLO's answer indicates a number of customers who have made purchases ("65") and a number of bundles that MORILLO has on hand ("14 pieces"). Based on MORILLO's answer, REYES stated he was going to bring additional drugs (or have additional drugs brought) to MORILLO ("I'm gonna bring you two more boxes").

   23. Similarly, based on my review of a preliminary, draft summary of a call intercepted over both the 3079 Phone and the 2464 Phone, and my training, experience, and involvement with this investigation, I have learned that on or about June 27, 2014 at approximately 7:05 p.m., ISRAEL REYES, a/k/a "PC," the defendant, using the 3079 Phone called ALEXANDER MORILLO, the defendant, at the 2464 Phone. During this call, the following conversation took place, in substance and part:

| | |
|---|---|
| MORILLO: | Yo. |

| | |
|---|---|
| REYES: | Yo how many people and what's left. |
| MORILLO: | 29 people. |
| REYES: | 29? |
| MORILLO: | Yea 29. |
| REYES: | Uhum |
| MORILLO: | and 230 left manito. |
| REYES: | 230 left? |
| MORILLO: | Yea. |
| REYES: | Uhm... and Lolo [Phonetic] send you four boxes over there right? |
| MORILLO: | Uhum. Yea with those boxes... yea. |
| REYES: | Alright say no more. |

24. Based on my training, experience, and involvement with this investigation, I believe that, during this call, ISAREL REYES, a/k/a "PC," the defendant, is asking ALEXANDER MORILLO, the defendant, how many people he has sold heroin to during that day and how much heroin he still has left ("how many people and what's left"). MORILLO responds by giving a number of bundles ("230") and stating that 29 customers had bought heroin from the DTO that day ("29 people"). Further, REYES is confirming that another member of the DTO, not named as a defendant herein ("CC-2") sent additional heroin to MORILLO ("Lolo send you four boxes over there right?")

25. Based on my involvement in this investigation and my review of preliminary, draft summaries and translations of communications intercepted over the 3079 and 2464 Phones, I have learned that JOSMARIL RODRIGUEZ, the defendant, also assisted ISRAEL REYES, a/k/a "PC," the defendant, and the other defendants in operating the DTO.

a. During interceptions over the 3079 and 2464 Phone, monitors identified a female co-conspirator of the DTO, who was referred to as "Kathy" by a customer of the DTO, who was using a phone ending in 5863 (the "5863 Phone") and the 3079 Phone, among other phones.

9

b. For the following reasons, I believe that RODRIGUEZ is the female co-conspirator called "Kathy" by the DTO customer.

i. First, based on my review of records obtained from the service provider, I have learned that RODRIGUEZ is the subscriber for both the 3079 and 5863 Phones.

ii. Further, subscriber information for these phones lists RODRIGUEZ's address as an apartment at Location-1.

iii. Additionally, on or about June 30, 2014, DEA agents were conducting surveillance and observed RODRIGUEZ in the company of ISRAEL REYES, a/k/a "PC," ALFREDO SANCHEZ, a/k/a "Gordo," the defendant, and others. RODRIGUEZ was identified based on a photograph obtained from the New York State Department of Motor Vehicles. During interceptions of REYES over the 3079 Phone during the time of surveillance, monitors heard the voice in the background previously identified as "Kathy" on the wiretaps.

iv. Finally, on or about July 1, 2014, Magistrate Judge Henry Pitman authorized the Government to begin obtaining precision location information for the 5863 Phone. Based on my conversations with Agent-1, I have learned that, on or about July 3, 2014, Agent-1 observed RODRIGUEZ and REYES traveling in a vehicle in Manhattan. Precision location information for the 5863 Phone indicated that the 5863 Phone was in the vehicle. As such, I believe that RODRIGUEZ is the female co-conspirator who was using the 5863 Phone.

26. Based on my review of a preliminary, draft summary of a call intercepted over the 3079 Phone and my training, experience, and involvement with this investigation, I have learned that on or about June 18, 2014 at approximately 9:10 a.m., JOSMARIL RODRIGUEZ, the defendant, using the 5863 Phone, called ISRAEL REYES, a/k/a "PC," the defendant, at the 3079 Phone. During this call, the following conversation took place, in substance and part:

RODRIGUEZ:     Yeah

REYES:         Yeah, what's up?

RODRIGUEZ:     Now what you want them to touch?

REYES:         The, the new stuff, one fifty

10

RODRIGUEZ:     Alright

27. Based on my training, experience, and involvement with this investigation, I believe that, during this call, JOSMARIL RODRIGUEZ, the defendant, was asking ISRAEL REYES, a/k/a "PC," the defendant, to indicate what drugs he wanted workers of the DTO to begin cutting or processing ("what you want them to touch"). By indicating "the new stuff, one fifty," REYES was indicating that he wanted the workers to work on a specific quantity of heroin that the DTO had recently received.

28. Based on my review of a preliminary, draft summary of a call intercepted over the 3079 Phone and my training, experience, and involvement with this investigation, I have learned that on or about June 26, 2014 at approximately 9:09 a.m., ISRAEL REYES, a/k/a "PC," the defendant, using the 3079 Phone, contacted JOSMARIL RODRIGUEZ, the defendant, at the 5863 Phone. During this call, following conversation took place, in substance and part:

RODRIGUEZ:     Hello.

REYES:         Yea um . . . ask Alex what he got left over there babe you heard?

RODRIGUEZ:     Alright.

REYES:         Alright. Alright.

29. Based on my training, experience, and involvement with this investigation, I believe that, during this call, ISRAEL REYES, a/k/a "PC," the defendant, was asking JOSMARIL RODRIGUEZ, the defendant, to check with ALEXANDER MORILLO, the defendant, ("ask Alex") on the quantity of narcotics that was remaining at MORILLO's location ("what he got left over there").

30. Based on my own involvement with this investigation and my conversations with other agents, I have learned that, during physical surveillance, agents have repeatedly observed a Red GMC Yukon (the "GMC Yukon") in the vicinity of both Location-1 and Location-2.

  a. Based on my review of New York Department of Motor Vehicles records, I have learned that the GMC Yukon is registered to ALFREDO SANCHEZ, a/k/a "Gordo," the defendant.

  b. Based on my conversations with Agent-1, I have learned that review of criminal history records for SANCHEZ showed that, in November 2013, the New York City Police

Department arrested SANCHEZ along with ALEXANDER MORILLO, the defendant, for Criminal Possession of a Controlled Substance with Intent to Sell.

      c. CS-1 identified a photograph of SANCHEZ as a person who CS-1 had previously seen deliver narcotics to customers, including CS-1 and associates of CS-1, on behalf of ISRAEL REYES, a/k/a "PC," the defendant.

      d. For the following reasons, I believe that SANCHEZ is the user of a phone number ending in 5284 (the "5284 Phone"). First, on or about June 27, 2014, while Agent-1 had SANCHEZ under surveillance, I called the 5284 Phone. Agent-1 observed SANCHEZ answer his cellphone immediately after I dialed the 5284 Phone and observed SANCHEZ put down his phone at the same time I disconnected the call with the 5284 Phone. Further, subscriber information obtained from the service provider indicates that the subscriber for the 5284 Phone is an individual who, based on a review of public records, lives in the same apartment as SANCHEZ.

      e. Based on my review of a preliminary, draft summary of a call intercepted over the 2464 Phone and my training, experience, and involvement with this investigation, I have learned that on or about June 17, 2014 at approximately 11:22 a.m., SANCHEZ using the 5284 Phone, contacted ALEXANDER MORILLO, the defendant, at the 2464 Phone. During this call, the following conversation took place, in substance and in part:

| | |
|---|---|
| SANCHEZ: | I think Garfield is there for fourth floor . . . . You got enough? |
| MORILLO: | You there? |
| SANCHEZ: | No, I'm on my way . . . . He told me to tell you to bring the tickets down so you can leave with me but I imagine you are taking this upstairs . . . . So where do I go up or down? |
| MORILLO: | Up. You good there. . . . . |
| SANCHEZ: | Alright. I'll call you when I'm there. |
| MORILLO: | The fire hydrant is open. The block is all good. |
| SANCHEZ: | Okay |
| MORILLO: | Is there food? |

12

SANCHEZ:        Yes

      31.  Based on my training and experience and involvement with this investigation, I believe that, during this call, ALREDO SANCHEZ, a/k/a "Gordo," the defendant, was informing ALEXANDER MORILLO, the defendant, that a customer ("Garfield") was waiting to pick up four bundles of heroin ("fourth floor"). Further, SANCHEZ was indicating that he was going to MORILLO's location to obtain proceeds ("tickets") from narcotics sales that MORILLO had previously made on behalf of the REYES DTO. When MORILLO stated "the block is all good," he was indicating that there was no police activity in the area. Finally, based on language used by the DTO during other interceptions in this case, I believe when MORILLO asked "Is there food?" he was asking SANCHEZ whether he was bringing additional drugs.

      32.  Based on my conversations with other DEA agents and my review of a preliminary, draft summary of a call intercepted over the 2464 Phone, I have learned that the following events occurred, on or about June 30, 2014:

      a. Agents were conducting surveillance in the vicinity of Location-2. CC-2 was observed walking out of Location-2 and putting two bags into a livery cab. Agents captured this on videotape. The livery cab then left the area and was followed by two unmarked DEA vehicles, one of which was a Mercury.

      b. Shortly thereafter, a call was intercepted between CC-2 and ALEXANDER MORILLO, the defendant, over the 2464 Phone. Based on my review of a preliminary, draft summary of the call, I have learned that the following conversation took place, in substance and in part:

CC-2:           Yo.

MORILLO:        Yo, talk to me bro'.

CC-2:           Nah, I just send some food. But, I need you to check something.

MORILLO:        Yeah.

CC-2:           As soon as I sent the cabbie, two cars got right behind it, they were parked in that block. But, I'm already... I'm about to head over there just

|||
|---|---|
| | to check them... they leave real quick. A blue Mercury and a black Caliber, Charger Caliber. |
| MORILLO: | Say that again. A Charger? |
| CC-2: | Caliber. A black Caliber. Black Caliber. |
| MORILLO: | Caliber and blue... |
| CC-2: | And a blue Mercury. |
| MORILLO: | A dark Caliber and a blue Mercury. |
| CC-2: | Yeah. |
| MORILLO | Okay, cool |
| CC-2: | Aight. |

      c. Based on the content of the call, it appears that CC-2 detected the DEA surveillance. Further, based on my training and experience and involvement in this investigation, I believe that the bags that CC-2 placed in the livery cab contained heroin ("food").

      d. Other agents subsequently observed the livery cab on Marion Avenue in the Bronx, in the vicinity of Location-1, a location where the DTO sells heroin to customers. Agents observed MORILLO walk towards the livery cab and retrieve two bags from the cab on Marion Avenue, which is perpendicular to the dead end of East 187th Street. As such, I believe that CC-2 was sending heroin from Location-2 to MORILLO at Location-1 in the livery cab.

      33. Based on my conversations with other DEA agents and my review of preliminary, draft summaries of calls intercepted over the 2464 and 3079 Phones, I have learned that the following events occurred, on or about June 19, 2014.

      a. At approximately 4:45 p.m. on June 19, 2014, DEA agents were conducting surveillance of Location-2. Agents saw the GMC Yukon in the vicinity of Location-2. Earlier that day the GMC Yukon had been seen by agents both in the vicinity of Location-1 and Location-2.

      b. An agent ("Agent-2") observed a co-conspirator not named as a defendant herein ("CC-3") exit Location-2

14

carrying a white plastic bag, which CC-3 then placed in the front passenger seat of the GMC Yukon.

   c. About ten minutes later, agents observed the GMC Yukon driving away from Location-2 and began following it. After about five minutes, agents terminated surveillance.

   d. At 5:02 p.m., a call was intercepted between CC-3 and ALEXANDER MORILLO, the defendant, using the 2464 Phone. Based on my review of a preliminary, draft summary of the call, I understand that the following conversation took place, in substance and in part:

| | |
|---|---|
| MORILLO: | You close? |
| CC-3: | I am at the parking lot. |
| MORILLO: | Oh, you at the parking lot? |
| CC-3: | Yeah |
| MORILLO: | Oh aight |
| CC-3: | So he's telling me to get out. |
| MORILLO: | Uh? |
| CC-3: | He's telling me to get out. |
| MORILLO: | What was that? You just waiting to get out? |
| CC-3: | Nah, he's telling me to get out. Like there is no more space he said. |
| MORILLO: | Oh, oh, oh. Nah, cause I thought you was on your way over here. |
| CC-3: | Yeah, I was nigga. I was being followed nigga. |
| MORILLO: | That what? |
| CC-3: | Somebody was following me |
| MORILLO: | Oh, somebody was following you? |
| CC-3: | Yeah. |
| MORILLO: | Okay. |

CC-3:              I had to go to the parking lot real quick.

MORILLO:           Yeah, kid.

   e.  At approximately 5:29 p.m., a call from JOSMARIL RODRIGUEZ, the defendant, using the 5863 Phone to ISRAEL REYES, a/k/a "PC," the defendant, at the 3079 Phone was intercepted. Based on my review of a preliminary, draft summary of the call, I understand that the following conversation took place, in substance and in part:

REYES:             Hello.

RODRIGUEZ:         Everybody good.

REYES:             Everybody good?

RODRIGUEZ:         Uh-hum.

REYES:             Aight, cool. Uh, uh, what I need y'all to do is... What I need y'all to do is figure out how we gonna get the rest of them box here. You heard? So, as a team y'all figure that out. You heard? While I'm handling whatever I gotta handle over here, you heard? Let them know that. Alright?

RODRIGUEZ:         All the ones that's over here? To send them out.

REYES:             Yeah, like figure something out and then call me back on what they figured out, how they get it out with...

RODRIGUEZ:         And where we sending it to? To "A"?

REYES:             Uh-hum.

RODRIGUEZ:         Okay, cool.

REYES:             'cause I don't wanna be with the in and out, that's it, it's a wrap

RODRIGUEZ:         Okay, okay.

REYES:             So, figure something out and call me back with what y'all think about

RODRIGUEZ:         Nah, I'ma do it... I'ma um... I'ma send the pampers to, to Alex' newborn, so he could use them' cause they don't fit the baby no more. That

16

|            |                                                                                                                                    |
|------------|------------------------------------------------------------------------------------------------------------------------------------|
|            | box of pampers that we...                                                                                                          |
| REYES:     | Alright, just give him a little bit. Let me um... Let him get a little [UI], you heard? Tell Lolo what he's [UI] to one box. You heard? |
| RODRIGUEZ: | Alright, honey.                                                                                                                    |
| REYES:     | Let him do that.                                                                                                                   |
| RODRIGUEZ: | Alright.                                                                                                                           |
| REYES:     | Alright.                                                                                                                           |

      f. Based on my training, experience, and involvement with this investigation, I believe that during the calls described above, the DTO was attempting to get heroin from Location-2 to Location-1.  On the first call summarized above, MORILLO, who was at Location-1, was asking CC-3 whether CC-3 would be arriving soon ("You close?").  CC-3 advised MORILLO that he believed (correctly) that he was being followed and had decided to pull into a parking lot as a counter surveillance technique ("Somebody was following me. . . .  I had to go to the parking lot real quick.").  In the second call, REYES instructs RODRIGUEZ to figure out a way to get the heroin that CC-3 was carrying to Location-1 ("Figure out how we gonna get the rest of them box here.")  REYES also indicates that he does not want to be personally involved in moving the drugs ("I don't wanna be with the in and out").  RODRIGUEZ suggests sending the drugs in a box ("I'ma send the pampers to . . . Alex' (i.e. MORILLO's) newborn.")  REYES indicates that CC-2 should also assist ("Tell Lolo what he's [UI] to one box. You heard?")

17

WHEREFORE, deponent prays that warrants be issued and that ISRAEL REYES, a/k/a "PC," ALFREDO SANCHEZ, a/k/a "Gordo," ALEXANDER MORILLO, and JOSMARIL RODRIGUEZ, the defendants, be arrested and imprisoned, or bailed, as the case may be.

_____
JARROD HALBER, SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn to before me this
9th day of July, 2014

_____
THE HONORABLE ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

18